UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BOARD OF COMMISSIONERS OF                    CIVIL ACTION
THE PORT OF NEW ORLEANS, ET
AL

VERSUS                                       NO: 07-6608

LEXINGTON INSURANCE COMPANY,                 SECTION: J
ET AL

### ORDER & REASONS

Before the Court is Plaintiff Board of Commissioners of the Port of New Orleans's ("Dock Board") and Defendants Universal Maritime Service Corporation's ("UMSC"), and Maersk, Inc.'s ("Maersk") **Cross Motions for Partial Summary Judgment (Rec. Docs. 90 & 92).** These cross-motions seek an order determining the right to claim ownership of leasehold improvements that were made prior to October 1, 2003. The motions were set for hearing on September 3, 2008. Upon review of the record, the memoranda of counsel, and the applicable law, this Court now finds as follows.

### PROCEDURAL HISTORY AND BACKGROUND FACTS

Prior to Hurricane Katrina, the Dock Board leased to UMSC a tract of land and improvements known as the France Road Terminal located in eastern New Orleans for maritime-related business. As a result of Hurricane Katrina, the leased premises sustained significant damage that rendered the facility unusable by UMSC. Pursuant to the lease agreement, UMSC exercised its option in

such an event to terminate the lease.  At this point, a "Lease Cancellation Agreement" was entered into by the Dock Board and UMSC which effectively terminated the lease on April 15, 2006. The Lease Cancellation Agreement required a "Joint Move-out Survey"  whereby both the Dock Board and UMSC assessed repairs that UMSC needed to make to the property.  According to the survey, only the fender system needed repair at a cost of $1,972.92, which USMC paid to the Dock Board.

The Dock Board subsequently filed suit in Civil District Court, Parish of Orleans, against UMSC, Maersk, and APM Terminals North America, Inc. ("APMT"),[1] alleging that UMSC breached the lease agreement by failing to repair, replace, and restore all damages to the facility.  Defendants removed to this Court, which granted UMSC's, Maersk's, and APMT's motion for partial summary judgment, finding that the Lease and Lease Cancellation Agreement only required the defendants to pay for damage that they themselves caused to the leased premises, and not all damages to the premises resulting from Hurricane Katrina.

After this initial partial summary judgment in favor of defendants, this Court ordered the parties to file all motions relating to "[w]hether the Dock Board, [UMSC, APMT, and/or Maersk] can claim the benefit of ownership of improvements that

---

[1]  Maersk and APMT are two of UMSC's parent or affiliated companies.  UMSC is wholly owned by APMT, which is wholly owned by Maersk.

were placed on the leased premises before October 1, 2003."
(Rec. Doc. 86).  Accordingly, the Dock Board filed the instant
motion for partial summary judgment and Maersk and UMSC filed
their cross-motion on the general issue of the right to claim
ownership of leasehold improvements under the relevant lease
provisions, and the concordant right to insurance proceeds on
those improvements.  This issue involves the provisions of two
different leases, as well as an amendment to one of those leases,
entered into between the Dock Board and various entities among
the defendants.

The first relevant lease was executed on August 19, 1971
("1971 Lease") between the Dock Board and Sea-Land for a 20 year
term with two 5 year extensions.  The 1971 Lease provided that
the lessee Sea-Land could remove all improvements it constructed.
However, if the lessee did not remove improvements prior to the
termination of the lease as the Dock Board might require, the
Dock Board had the right under Section 19.03 ("§19.03") of the
lease to collect double rent, to remove the improvements at its
own cost while charging double rent until such removal, or to
retain any improvements without reimbursement to Sea-Land unless
other written arrangements had been made.[2]

_____

[2]  See Pl.'s Memo Supp. Sum. J., Ex. 2 at §19.03.  This
provision states in full:

If the facilities, buildings and structures **which are
required by Lessor to be removed** from the premises and

3

The next relevant provision resulted from an amendment to the 1971 Lease executed on June 22, 1973, by the Dock Board and Sea-Land ("1973 Amendment").  The purpose of the 1973 Amendment was to expand the area of the leased premises to make room for specifically enumerated  new construction to accommodate Sea-Land's increased European container trade through the Port of New Orleans.  Because the Dock Board did not have the necessary funds for the construction projects, the 1973 Amendment provided that Sea-Land would advance the funds to the Dock Board to pay for the new construction, subject to Sea-Land's ownership of the improvements.  However, Paragraph 3 of the Agreement ("¶3") provided that:

> [i]n the event that [the 1971 Lease] should not become of force and effect or in the event of termination of the lease, **for any cause**, the facilities and improvements described in this paragraph that are to be constructed

---

substantially all trash, stocks of material, supplies, tools, etc., placed on the leased premises by Lessee or Lessee's agents, shall have not been removed by Lessee prior to the date of termination of this Lease, it will be optional with Lessor, either to collect this double rent as liquidated damages until the said facilities, buildings and structures, trash, stocks of materials, supplies, tools, etc., have been , removed by Lessee; or to remove the same at Lessee's cost, risk and expense, the double· rental to continue until ultimate removal thereof, .or to retain the same, or any part thereof, without payment or reimbursement to Lessee, unless other arrangements have been made in writing between Lessor and Lessee with regard to the removal thereof (emphasis added).

solely for the account of Sea-Land shall then be and become property of the [Dock Board], without any obligation on the part of the [Dock Board] to pay to Sea-Land either the cost or the value thereof and without the necessity of any documentation of title beyond the provisions of this agreement.[3]

Sea-Land executed both 5 year extensions of the 1971 Lease (as modified by the 1973 Amendment), thus extending the 1971 Lease to its full 30 year term.  In 1999, the 1971 Lease between the Dock Board and Sea Land was assigned to Maersk (as a result of its acquisition of Sea-Land) without any change in the terms of the lease.  However, prior to the expiration of the 1971 Lease, the Dock Board and Maersk began negotiations to ensure Maersk's continued commercial presence at the France Road Terminal.  The result of these negotiations was a new lease effective October 1, 2003 ("2003 Lease").  However, the signatory lessee on the 2003 Lease was UMSC, not Maersk.

Additionally, Section 19(G) of the 2003 Lease ("§19(G)") provided that in the event of termination of the lease, UMSC would only be entitled "to receive from the insurance proceeds [its] insurable leasehold interest in those improvements on the Leased Premises **approved by [the Dock Board]** and **paid for by Lessee.**"[4]  Additionally, the 2003 Lease, Section 45, provided the

---

[3]  Pl.'s Memo Supp. Summ. J., Ex. 3 at ¶3.

[4]  Pl.'s Memo Supp. Sum. J., Ex. 1 at §19(G) (emphasis added).

following provision regarding the scope of its effect:

> "This Lease constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and **shall supercede all prior negotiations**, discussions, correspondence, contracts, obligations, understandings and agreements between the parties relating to the subject matter hereof or to the Leased Premises, provided, however, that **this provision shall not be interpreted in any way to waive any rights which one party may have against the other arising out of that lease between the [Dock Board] and Maersk, Inc., effective August 19, 1971,** which included the Leased Premises of this Lease, and which terminated on the effective date of this Lease."[5]

UMSC, the lessee in the 2003 Lease and a wholly owned subsidiary of Maersk,[6] had operated the France Road Terminal on behalf of Maersk since 1999.  Also, the Dock Board had agreed that UMSC would operate the France Road Terminal facility on behalf of Maersk in its consent to the assignment of the lease to Maersk.[7]  However, regardless of the relationship between Maersk and UMSC and the Dock Board's knowledge of that relationship, UMSC was the only signatory lessee to the 2003 Lease. Additionally, there was some confusion throughout the negotiations between Maersk, the Dock Board, and USMC regarding

---

[5]  Pl.'s Memo Supp. Sum. J., Ex. 1 at §45.

[6]  UMSC is a wholly owned subsidiary of APMT, which is itself a wholly owned subsidiary of Maersk.  Def. Memo Supp. Summ. J., Ex. D; Corporate Disclosure Statement of Maersk, Rec. Doc. 8.

[7]  See Def.'s Memo Opp. Summ. J., Ex. A at pp.53-55.

the nature of the relationship between Maersk and USMC.[8]

These three lease provisions and the nature of the relationships among the parties form the basis of the right to claim ownership of leasehold improvements at the France Road Terminal at the time Hurricane Katrina struck in 2005.  The right to claim ownership of the improvements is critical to a determination of whether the Dock Board, Maersk, or UMSC is entitled to insurance proceeds on the improvements.[9]

---

[8]  See Id.

[9]  As noted by the Dock Board, the resolution of the broad issue of the *right to claim ownership* of specific improvements will not resolve the narrower issue of the parties' *actual ownership* of individual improvements.  As such, "a decision on this issue still leaves some issues remaining before a final determination can be made as to which party is actually entitled to the insurance proceeds for the damage to each separate leasehold improvement."  Pl.'s Memo Supp. Summ. J., 5. Nonetheless, the following specific improvements and categories of improvements are mentioned by the parties throughout the pleadings, and are described here for reference:

- General improvements made to the France Road Terminal by the lessee under Section 14.01 of the 1971 Lease, which allowed for the lessee under the 1971 Lease to make improvements "including but not limited to dockside gantry crane[s]."
- Specific improvements made to the France Road Terminal by the lessee under Sections 2.01-2.02 of the 1971 Lease, namely "dockside gantry cranes, gantry crane rails, filling in of rail grooves, electrical service for gantry cranes, and/or other mobile handling equipment."
- 13 specific and mandatory improvements constructed by the lessee under the 1973 Amendment, namely the items listed in paragraph 3 of the Agreement section of the 1973 Amendment (e.g., various concrete structural elements, drainage facilities, and various other infrastructure improvements)

7

## THE PARTIES ARGUMENTS

**A.   The Dock Board's Motion for Summary Judgment**

In its motion for summary judgment, the Dock Board argues that the 1971 Lease and the 1973 Amendment expressly provide that termination of the 1971 Lease *for any reason* vests title in the Dock Board for all leasehold improvements made during those leases.  As such, the Dock Board argues that the execution of the 2003 Lease on October 1, 2003, terminated the 1971 Lease (as amended by the 1973 Amendment), thus vesting title in all pre-October 1 improvements in the Dock Board.  In support of this argument, the Dock Board refers to §19.03 of the 1971 Lease as well as ¶3 of the 1973 Amendment, both of which indicate that termination of the 1971 Lease will vest ownership of improvements under that lease in the Dock Board.  As such, the Dock Board asserts that it alone has title to all pre-October 1 improvements and the concordant right to insurance proceeds on those improvements.

Furthermore, as a procedural note in support of its motion for summary judgment, the Dock Board notes that neither Maersk not APMT has claimed in any prior pleading that they are entitled to ownership of any of the damaged improvements at issue in these

---

&bull; Specific improvements by UMSC during the term of the 2003 Lease, namely a fender system, office building roof, and roadability awning.  None of these improvements are at issue in these motions as they were all constructed after October 1, 2003.

8

motions.  As such, the Dock Board suggests that the heart of the issue is whether *UMSC alone* can claim title to the improvements over the Dock Board.  The Dock Board argues that under §19(G) of the 2003 Lease and regardless of the provisions of the 1971 Lease and the 1973 Amendment, UMSC, as sole lessee under the 2003 Lease, is not entitled to any insurance proceeds for any improvements prior to October 1, 2003.  The Dock Board points out that §19(G) provides that the lessee UMSC is only entitled to insurance proceeds at termination of the 2003 Lease for "improvements on the Leased Premises **approved by [the Dock Board] and paid for by Lessee**."  According to the Dock Board, this Court's order (Rec. Doc. 62) granting UMSC's motion for partial summary judgment resulted in a termination of the 2003 Lease, thus triggering §19(G).  However, no improvements to the France Road Terminal prior to October 1, 2003, could have been paid for by UMSC as lessee, because UMSC *was not a lessee* until October 1, 2003.  For the same reason, the Dock Board argues that it could not have approved any improvements by UMSC pursuant to §19(G) of the 2003 Lease prior to October 1, 2003, because the 2003 Lease *was not in effect* prior to that date.  As such, the Dock Board argues that UMSC is not entitled to insurance proceeds on the pre-October 1 leasehold improvements under the express terms of §19(G) of the 2003 Lease.

While the Dock Board argues that these motions can be

9

decided solely under §19(G) of the 2003 Lease, it also argues
that even if that section does not apply and if UMSC shares some
relationship with Maersk and APMT, none of those three entities
can claim insurance proceeds on the pre-October 1 improvements
under the relevant lease provisions.  First the Dock Board argues
that §19.03 of the 1971 Lease between the Dock Board and Sea-Land
unequivocally states that termination of the lease results in the
Dock Board's taking title to any improvements that the lessee has
not removed.  Similarly, the Dock Board asserts that ¶3 of the
1973 Amendment expressly states that title to the improvements
made by Sea-Land pursuant to the 1973 Amendment would
automatically vest in the Dock Board upon termination of the 1971
Lease "for any cause."  Accordingly, the Dock Board argues that
when Sea-Land assigned the 1971 Lease, as amended by the 1973
Amendment, Maersk became subject to the termination provisions of
§19.03 and ¶3.

The Dock Board then argues that after the assignment of the
1971 Lease to Maersk and the imminent expiration of the 30 year
term of that lease, Maersk and the Dock Board began negotiations
to keep Maersk as a commercial presence at the France Road
Terminal.  During these negotiations, the Dock Board alleges that
Maersk insisted on a new lease, as opposed to an amendment
extending the term of the 1971 Lease.  Additionally, the Dock
Board asserts that Maersk refused to sign the new lease and

10

required that UMSC sign as lessee.  The Dock Board acquiesced
"because [it] was convinced [it] would not get a lease if [it]
did not give in on this point."  Pl.'s Memo Supp. Summ. J., 16.

As such, the Dock Board argues that Maersk's refusal to sign
the new lease, and USMC's signature as lessee on the new lease,
effectively terminated the 1971 lease, thus triggering the
termination/title-vesting provisions of the 1971 Lease and the
1973 Amendment.  To support its argument, the Dock Board points
to §45 of the 2003 Lease, which expressly provides for
termination of the 1971 Lease by the execution of the 2003 Lease.
Accordingly, because neither Sea-Land, Maersk, nor APMT
transferred title to UMSC for any pre-October 1, 2003
improvements before title vested in the Dock Board under the
termination provisions, UMSC has no right to claim ownership of
those improvements or the concomitant right to insurance
proceeds.  Therefore, the Dock Board asserts that it alone has a
right to claim ownership of those improvements.

The Dock Board concedes that §45 does include a reservation
of the parties rights under the 1971 Lease.[10]  However, the Dock
Board argues that this language was only intended to preserve the

_____

[10]  The reservation-of-rights provision provides as follows:
"this provision shall not be interpreted in any way to waive any
rights which one party may have against the other arising out of
that lease between the [Dock Board] and Maersk, Inc., effective
August 19, 1971, which included the Leased Premises of this
Lease, and which terminated on the effective date of this Lease."
Pl.'s Memo Supp. Sum. J., Ex. 1 at §45.

Dock Board's right to unpaid rents under the 1971 Lease *after its termination*.  The Dock Board points out that §45 "does not reserve any rights which Maersk had before termination (to remove leasehold improvements) which were *lost on termination*."[11]  As such, the Dock Board argues that after termination of the 1971 Lease, Maersk lost its rights in any improvements it did not remove, and title to those improvements vested in the Dock Board. To support this argument, the Dock Board suggests that the reason Maersk itself has not asserted any right to claim ownership of the improvements, and instead has supported USMC's right to the improvements, is that Maersk lost any right to claim ownership under the provisions of §45.  The Dock Board notes that Maersk could have made other written arrangements for disposition of the improvements at termination under §19.03 of the 1971 Lease, but chose not to do so.

The Dock Board further argues that there was no tacit reconduction of Maersk's lease when UMSC signed the 2003 Lease because the 2003 Lease involved different parties, different premises, different rent, as well as many other differences that render the 2003 Lease a new lease and not a mere reconduction.

Finally, the Dock Board argues as a matter of equity that UMSC as lessee had an obligation under the 2003 Lease to repair the facilities damaged by Katrina.  UMSC chose to cancel the

---

[11]  Pl.'s Memo Supp. Sum. J., 25.

12

lease in order to avoid its repair obligations by agreeing to
assign any insurance proceeds to the Dock Board.  As such, the
Dock Board argues that UMSC would be enriched if it were not
required to turn over insurance proceeds to the Dock Board,
because UMSC would receive those proceeds without any obligation
to repair the damaged improvements under the cancelled lease.

In opposition, Maersk/UMSC argue that while neither Maersk
nor APMT asserted claims to ownership of any improvements at the
France Road Terminal in their Answer, this Court's order framing
the issue for future motions expressly names Maersk, UMSC, and
APMT as possible parties with a right to claim ownership of the
improvements.  As such, Maersk/UMSC argue that the Dock Board
cannot cite the lack of claim to ownership by Maersk and APMT in
support of this motion since they themselves were involved in
crafting the language of this Court's order, which recognizes
Maersk's and APMT's right to make such claims by motion.

Next, Maersk/UMSC challenge the Dock Board's theory that
UMSC and Maersk are separate lessees under unrelated leases as
being contrary to the Dock Board's own pleadings, as well as the
facts.  First, Maersk/UMSC note that the Dock Board asserted in
its complaint that Maersk, UMSC, and APMT constituted a "single
business enterprise," and as such were all liable for UMSC's
obligations under the 2003 Lease.  Thus Maersk/UMSC argue that
the Dock Board itself recognized that these three entities were

13

significantly related when it benefitted the Dock Board to do so
while seeking damages under the lease.  However, now that it has
lost its argument that the lease was breached, the Dock Board is
conveniently switching from the single business enterprise theory
to attempt to win on the issue of ownership of improvements.  In
addition to this procedural argument, Maersk/UMSC also allege
that the Dock Board knew at all times that Maersk and UMSC were
significantly related, and even knew that UMSC was a wholly owned
subsidiary of Maersk.  In sum, Maersk and UMSC suggest that
"[t]he Dock Board, for all practical purposes, when dealing with
Maersk and [UMSC] considered them to be interchangeable."  Defs.'
Memo Opp. Summ. J., 5.

     To further underscore their argument, Maersk/UMSC point to
Section 32 of the 2003 Lease which provides in full:

> Lessee shall not assign this Lease in whole or in part of
> sublet the Leased Premises or any portion of them to
> anyone without in each case the prior written consent of
> Board. Lessee shall not permit any transfer by operation
> of law of any of the Lessee's interest in the Leased
> Premises . . . . The above notwithstanding, Lessee may at
> any time assign this Lease without Board's prior consent
> to a **Permitted Assignee as defined in Section 21
> ("Default")** above, provided Lessee gives written notice
> of such assignment to Board on or before the effective
> date of any such assignment.[12]

Section 21, referenced in Section 32, defines a "Permitted
Assignee" as "APM Terminals North America, Inc., APM Terminals

---

[12]  Pl.'s Memo Supp. Sum. J., Ex. 1 at §32.

Pacific LTD or Maersk, Inc."[13]   Citing documents from the Dock
Board's Rule 30(b)(6) deposition, Maersk and UMSC note that
during the negotiations of the 2003 Lease, Maersk actually sought
an unconditional right for UMSC to assign the lease, which the
Dock Board ardently opposed based on its responsibility as a
quasi-public entity to ensure the financial viability of its
tenants.   Nonetheless, the Dock Board's agreement to allow UMSC
to unconditionally assign its rights under the 2003 Lease to
Maersk and APMT indicates that the Dock Board knew that there was
a significant relationship between UMSC and those other entities.

   Additionally, Maersk/UMSC point out that §45 of the 2003
Lease expressly reserves the rights of the Dock Board and Maersk
under the 1971 Lease.   Maersk/UMSC accordingly argue that the
termination of the 1971 Lease by the 2003 Lease did not cut off
their right to remove or claim ownership of leasehold
improvements because §45 reserved all parties' rights under the
1971 Lease.   Further, Maersk/UMSC argue that the 2003 Lease also
protects Maersk/UMSC's ownership of the pre-October 1, 2003
improvements.   Specifically, Maersk/UMSC note that  §19(G) allows
the lessee under the 2003 Lease to collect proceeds on its
"insurable leasehold interest in those improvements on the Leased
Premises approved by [the Dock Board] and paid for by **Lessee.**"
As such, Maersk/UMSC argue that since Maersk and UMSC were for

---

   [13]   Id. at §21(A)(iii).

15

all practical purposes the same entity, all pre-October 1, 2003 improvements were necessarily "approved" by the Dock Board and "paid for" by either Maersk or Sea-Land as lessee, and thus those improvements remain the property of Maersk/UMSC under §19(G).

The majority of Maersk/UMSC's Opposition Memorandum criticizes the Dock Board's position as an example of the widely rejected "Forfeiture Rule." The Forfeiture Rule provides that a lessee's right to remove improvements made by him to the leased premises is cut off by the execution of a subsequent lease covering the same property. Maersk and UMSC argue that this rule has long been roundly rejected by American courts in situations where the lessee retains *occupancy* of the leased premises. Accordingly, Maersk and UMSC argue that because UMSC operated the terminal on behalf of Maersk, the 2003 Lease, although signed by UMSC as lessee, did not terminate the *occupancy* of the Maersk/UMSC conglomerate on the leased premises. Thus the widely rejected Forfeiture Rule should not apply.

As such, Maersk/UMSC argue that the 2003 Lease was actually a "*de facto* continuation" of the 1971 Lease. Def.'s Memo Supp. Summ. J., 2. Further, Maersk/UMSC assert that the Dock Board made no demand for removal of any improvements at the execution of the 2003 Lease because both parties "clearly considered the 2003 Lease to be a continuation of the prior lease." Id. at 3. In support, Maersk/UMSC note that the Dock Board agreed in the

16

assignment of the 1971 Lease by Sea-Land to Maersk that UMSC "shall operate the Premises on behalf of Maersk."  Def. Memo Supp. Summ. J, Ex. A at Ex. 5 ¶5.  Practically speaking, Maersk/USMC note that the transition between the 1971 Lease and the 2003 Lease periods was seamless, with no move-out surveys, no cessation of operations on the leased premises, and most importantly no demand for removal of any improvements.

Accordingly, Maersk/UMSC point specifically to Section 2.03 of the 1971 Lease, which provides that any electrical cargo equipment or gantry cranes "shall become the property of the [Dock] Board **at the termination of** [lessee's] **occupancy**" of the France Road Terminal, not at termination of the lease.  Under this provision, Maersk and UMSC argue that the electrical equipment and gantry cranes installed under the 1971 Lease remain the property of Maersk/UMSC because they have continuously *occupied* the France Road Terminal.  Additionally, Maersk/UMSC argue that the 13 specific improvements under the 1973 Amendment also remain the property of Maersk/UMSC.  Even though the 1973 Amendment specifically states that the 13 improvements shall become the Dock Board's property at termination of the 1971 Lease, Maersk/UMSC argue that the provisions of the 1973 Amendment did not supercede Maersk/UMSC's right to *remove* improvements prior to termination of the 1971 Lease, as provided in §19.03 of the 1971 Lease.  Finally, Maersk/UMSC argue that all

other improvements under the 1971 Lease and the 1973 Amendment remained their property after termination by the 2003 Lease and notwithstanding §19(G) of the 2003 Lease, either under their contractual right to remove those improvements or due to their continued occupancy of the leased premises and the inapplicability of the Forfeiture Rule.

**B.  Maersk & UMSC's Motion for Partial Summary Judgment**

Maersk/UMSC's Motion for Partial Summary Judgment seeks an order that the termination of the 1971 Lease by the 2003 Lease did not result in Maersk/UMSC's loss of ownership of pre-October 1, 2003 improvements to the France Road Terminal.  Generally, Maersk/UMSC argue that the right to claim insurance proceeds must be determined by *ownership* of the insured improvements, not provisions of a lease. Maersk/UMSC make essentially the same arguments in support of their cross-motion as they did in their opposition to the Dock Board's motion, focusing mostly on the rejection of the Forfeiture Rule.

Specifically, Maersk/UMSC allege that the Dock Board intended the 2003 Lease to be a continuation of the 1971 Lease and that Maersk/UMSC continuously occupied the premises throughout the relevant period.  First, Maersk/UMSC reiterate that there was no cessation of operations by Maersk/UMSC at the France Road Terminal, nor demand for removal of any improvements, upon termination of the 1971 Lease and commencement of the 2003

18

Lease.  Further, Maersk/UMSC note that unlike the cancellation of the 2003 Lease, there was no "move out" survey when the 1971 Lease allegedly terminated.  Finally, UMSC/Maersk point out several documents from the 2003 Lease negotiations that indicate the Dock Board and Maersk/UMSC all viewed the 2003 Lease as a renewal and updating of the 1971 Lease.[14]  In sum, Maersk/UMSC argue that the 2003 Lease was merely a renewal under new terms of the 1971 Lease, which was over thirty years old and had become unwieldy as a result of 8 different amendments.

In opposition, the Dock Board first argues that Maersk/UMSC incorrectly focus on the issue of *ownership* of improvements under §19(G) the 2003 Lease.  The Dock Board notes that UMSC admits that its right to insurance proceeds on improvements hinges on §19(G), which depends on approval by the Dock Board and payment by the lessee, not ownership, as the relevant factors for determining who is entitled to insurance proceeds.  The Dock Board argues further that this Court has already held that when UMSC chose to cancel the 2003 Lease, "the  bargain of the lease [was] that, upon termination due to catastrophic loss or

---

[14]  For example, Maersk/UMSC cite a letter from the Dock Board's CEO stating that the Dock Board was "pleased to offer several proposals to Maersk-APM for *your continued lease of the Board facilities* beyond October 1, 2003."  Def.'s Memo Supp. Summ. J., 17-18.  Another letter from Mr. LaGrange noted that "[UMSC] and the [Dock Board] signed a new lease for Maersk-Sealand's continued occupancy of France Road Berth 1 Terminal through September 2008."  Id. at 18.

destruction of the leased premises unrelated to the lessee's fault, the lessee [was] relieved of its repair obligation by delivering to the Dock Board the insurance proceeds associated with such damages." (Rec. Doc. 62). As such, the Dock Board argues that UMSC must pay *all insurance proceeds*, including those payable on improvements to the France Road Terminal, to comply with its part of the bargain. Essentially, therefore, the Dock Board argues that UMSC's choice to terminate the lease resulted in a waiver of its right to claim insurance proceeds on leasehold improvements. The Dock Board alleges that Maersk/UMSC are attempting to twist the language of §19(G) as a means of side-stepping their obligation to pay all insurance proceeds as required under this Court's interpretation of the 2003 Lease. Accordingly, because none of the pre-October 1, 2003 improvements on the France Road property were "approved" by the Dock Board nor "paid for by the lessee" under the 2003 Lease (UMSC), *all proceeds* on improvements are payable to the Dock Board under §19(G). Under this analysis, the Dock Board argues that this Court's order and §19(G) are determinative of the issues in these cross-motions.

The Dock Board asserts in response to Maersk/UMSC's arguments under the Forfeiture Rule that it does not rely on the Forfeiture Rule at all. Instead, the Dock Board asserts that its claims are based on the express provisions of the 1971 Lease and

the 1973 Amendment.  The Dock Board distinguishes the cases cited by Maersk/UMSC by noting that those cases all involved situations in which 1) the *same lessee* renewed a lease and 2) the prior lease did not contain an express provision vesting title in the lessor at termination of the lease.  However, the Dock Board argues that this case involves a second lease with a different lessee, and a prior lease that includes an express provision vesting title in the lessor upon termination of that lease. Accordingly, the Dock Board asserts that "Maersk's loss of a claim for leasehold improvements arises not from enforcement of the 'forfeiture rule,' but as a result of the terms and provisions of the [1971 Lease] contract."  Pl.'s Mem. Opp. Summ. J., 9.

Additionally, the Dock Board proposes that Maersk/UMSC's argument regarding the *de facto* renewal of the 1971 Lease is subject to the Louisiana law of lease reconduction.  Under these Louisiana lease principles, the Dock Board asserts that the 2003 Lease was not a reconduction, but a new lease based on a litany of differences between the 2003 Lease and the 1971 Lease,[15] most

---

[15]   Examples of the differences include: 1) identity of Lessee; 2) the terminal size; 3) cancellation provision; 4) the amount of rent charges; 5) conditions on which cargo is calculated and the method of calculation along with cargo rates; 6) existence of a delinquency fee; 7) construction, maintenance and repair provisions; 8) damage and destruction provision; 9) insurance requirements in both types and amounts of insurance; 10) default provisions which were non-existent in 1971; 11) security requirement which did not exist in 1971; 12) indemnity provisions;

prominent of which is the existence of UMSC as a new lessee in
the 2003 Lease.  Thus, the Dock Board argues the 2003 Lease
necessarily terminated the 1971 Lease and triggered its
termination/vesting provisions.

In response, Maersk/UMSC argue that actual ownership of the
improvements, not the provisions of the 2003 Lease, determine who
has a right to insurance proceeds on the improvements. Further,
Maersk/UMSC assert that §19(G) is actually intended to prevent
the result that the Dock Board is attempting to achieve.  In this
vein, Maersk/UMSC argue that the Dock Board's position treats the
right to ownership of improvements differently based on the
manner of cancellation of the lease.  If the lease is cancelled
pursuant to 19(C) (the destruction clause), then the lessee can
only receive insurance proceeds if it paid for the improvements.
However, if the lease were cancelled under any other clause (such
as by six-month notice), the lessee could remove improvements
that it owns regardless of whether it actually paid for those
improvements.  Maersk/USMC assert that there is no basis for this
distinction.

With respect to the Dock Board's equity argument,
Maersk/UMSC argue that the Dock Board is not entitled to
insurance proceeds to repair structures *it does not own*, and

---

13) rules for interpreting contract.  Pl.'s Memo Opp. Summ. J., 8.

which Maersk/UMSC own and could remove at any time.  Thus according to Maersk/UMSC, the Dock Board would receive a windfall if it were allowed to collect insurance proceeds on structures it does not own.

Finally, Maersk/UMSC dispute the Dock Board's position that the Forfeiture Rule is not applicable when the prior lease includes provisions regarding disposition of improvements upon termination.  Specifically, Maersk/UMSC argue that all the Forfeiture Rule cases they have cited involve situations in which the original lease provided for removal of improvements by the lessee, and the subsequent lease was silent regarding the removal of improvements.

## DISCUSSION

### A.  Summary Judgment Standard under Rule 56 of the FRCP

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

**B.   The Forfeiture Rule and Louisiana Lease Law**

The principal case cited by Maersk/UMSC in support of its argument under the Forfeiture Rule is <u>Anderson Tully Co. v. United States</u>, 189 F.2d 192 (5th Cir. 1951).   The rule as stated in <u>Anderson Tully</u>, which applied Mississippi lease law, provides that "a lessee's right to remove erections made by him in furtherance of the purpose for which the premises were leased continues during his original term and during such further period of possession as he holds the premises under a right still to consider himself a tenant."   <u>Id</u>. at 197.   The alternative view, namely that "a tenant's right to remove fixtures or improvements placed on the premises during the term of a lease is lost to the tenant by the taking of a new or renewal lease which does not mention any claim to fixtures" has been "so often repudiated" that it is no longer supportable.   <u>Id</u>.   In support of the Forfeiture Rule argument, Maersk/UMSC cite several non-Louisiana cases that have applied the rule.   See <u>Bergh v. Herring-Hall-Marvin Safe Co.</u>, 136 F. 368 (2d Cir. 1905); <u>Lilenquist v. Pitchford's, Inc.</u>,525 P.2d 93 (Or. 1974).

Louisiana courts have come to a similar conclusion under the Civil Code principles governing the contract of lease.   The leading Louisiana case on this issue is <u>Pendleton v. Shell Oil Co.</u>, 408 So. 2d 1341 (La. 1982).   In <u>Pendleton</u>, the defendant Shell Oil and the plaintiff entered a lease in 1957 for a 15 year

24

term with a 5 year option to extend.  Id. at 1341-42.  The 1957
lease included the following provision: "All buildings and
improvements constructed, installed or placed on the premises by
Shell, **at any time during the term of this lease or any extension
thereof or any tenancy thereafter**, shall become Lessor's property
at the termination of this lease or any tenancy thereafter."  Id.
at 1342 (emphasis added).  During the period of this 1957 lease,
Shell Oil constructed an automobile service station.  Id.  In
1969, Shell Oil and the plaintiff entered a new lease on the
premises in order to modernize the facilities, thus terminating
the 1957 lease.  Id.  During the period of the 1969 lease, Shell
Oil demolished the service station that had been built on the
plaintiff's property under the 1957 lease, and built a newer,
larger station on an adjacent property belonging to a different
lessor.  Id.  As a result, and under the title-vesting clause of
the 1957 lease, plaintiff claimed that Shell Oil had breached the
1969 lease by demolishing the old service station, which
plaintiff claimed had become its property at termination of the
1957 lease.  Id.  The Pendleton court held:

> While it is true that the 1957 lease was terminated by
> mutual agreement on July 31, 1969, this agreement was
> reached in contemplation of a new lease effective August
> 1, 1969. **Inasmuch as Shell continued to occupy the
> premises under a new lease, the new lease between Shell
> and plaintiffs constituted a "tenancy thereafter" within
> the terms of the 1957 lease. Hence, ownership of the
> service station building continued in Shell despite the
> termination of the 1957 lease.**

25

Id. (emphasis added).  As such, the Pendleton court found that Shell Oil retained ownership and the parallel right to demolish the service station under the 1957 lease and the new 1969 lease.

Similarly, the Louisiana First Circuit Court of Appeal followed Pendleton in Metzler v. Rising T Racing Stables.  461 So. 2d 1219 (La. App. 1 Cir. 1984).  In Metzler, the plaintiff and defendant entered a lease with an option to purchase in May of 1980, with a term of one year.  Id. 1222.  The lease provided that "any additions made to the property by the Lessee shall become the property of the Lessor at the termination of this lease unless the property is purchased by the Lessee."  Id.  In May of 1981 as the lease term was about to end, the parties informally agreed to "continue to lease [the] property" on a month-to-month renewable basis.  Id.  At some point, the defendant installed a barn, fences, and horse walker on the leased property, all three of which were later dismantled.  Id. at 1222.  The first circuit affirmed the trial court's denial of the plaintiff's claim that it was entitled to damages for the defendant-lessee's destruction of the improvements based on the fact the plaintiff did not prove whether the barn, fence and horse walker had been installed during the term of the 1980 lease.  Id. at 1224.  Because the plaintiff could not prove the date when the improvements were made, the title-vesting clause of the 1980 lease never became operative.  Id.  The Metzler court

summarized that "Pendlton, and [Louisiana Civil Code articles]
2726, 465, 466, 493, and 495 are the legal authority, taken in
combination and with the original [1980 lease]" for the refusal
to vest title in the improvements in the plaintiff.  Id.
Although the Metzler court found in favor of the defendant-
lessee, the court did affirm the trial court's holding that the
informal letter agreement to continue the lease on a month-to-
month basis was *not a reconduction*, and was in fact a termination
of the 1980 lease.  Id. at 1223.

     Crucial to the holdings of both the Pendleton and Metzler
courts was the fact that the initial leases in both cases had
*terminated* and had not been renewed or otherwise reconducted
under Louisiana law.  In Pendleton, the termination/vesting
clause of the 1957 lease was not triggered because that lease
included other language, namely the "tenancy thereafter"
provision, that extended the right of the lessee to retain
improvements beyond the termination date of the lease.  In
Metzler, the termination/vesting provision of the 1980 lease was
not triggered because the plaintiff had not proven that the
improvements at issue were actually constructed during the term
of the 1980 lease.  The instant case is distinguishable from both
cases.

     As noted by the Dock Board, the 1971 Lease does not include
any provision similar to the "tenancy thereafter" language of the

lease in _Pendleton_.  Also, the _Pendleton_ case involved two leases
between the same parties as lessor and lessee, whereas the
instant case involves leases between the Dock Board and two
different nominal lessees.  As a result, Maersk/UMSC's reliance
on the _Pendleton_ case is unfounded both as a matter of law and
fact.  Maersk/UMSC rely heavily on the _Pendleton_ court's ruling
that "[i]nasmuch as Shell continued to occupy the premises under
a new lease, the new lease between Shell and plaintiffs
constituted a 'tenancy thereafter' within the terms of the 1957
lease."  This language, according to Maersk/UMSC, indicates that
the _Pendleton_ court's ruling was not focused on whether or not
the post-termination occupancy was under a new lease, but rather
on the actual fact of such occupancy.  However, the _Pendleton_
court's decision that Shell Oil retained ownership of the
improvements "despite termination of the 1957 lease" reveals that
the court relied exclusively on the "tenancy thereafter" language
of the 1957 lease as the basis for its ruling.  Because §19.03,
the general termination/vesting provision of the 1971 Lease, does
not include the "tenancy thereafter" language of the lease at
issue in _Pendleton_, Maersk/UMSC's argument under _Pendleton_ fails.

     Also, while Maersk/UMSC admit on the one hand that the 2003
Lease "replaced" the 1971 Lease, they also variously refer to the
2003 Lease as a "renewal" or "_de facto_ continuation" of the 1971
Lease.  As such, if the 2003 Lease did in fact "replace" the 1971

Lease, then the 1971 Lease was terminated and any termination provisions of that lease would have been triggered.  However, Maersk/UMSC's reference to renewal and continuation suggest an argument that the 1971 Lease was somehow reconducted under Louisiana law by the 2003 Lease.  Under Louisiana lease law, a lease is reconducted when "after the expiration of the term, and without notice to vacate or terminate or other opposition by the lessor or the lessee, the lessee remains in possession" for a certain period of time.  La. Civ. Code Art. 2721 (2008).  However, "Louisiana jurisprudence has long recognized . . . that the Civil Code articles providing for reconduction have no application whatever when either party has clearly announced [its] intention not to renew the lease on same terms."  <u>Id</u>. at cmt. d (internal quotations and citations omitted).  Accordingly, given that Maersk clearly announced its intention not to renew the 1971 Lease on its same terms, the 2003 Lease was not a reconduction or any other kind of renewal of the 1971 Lease's terms.  Thus, as in the <u>Metzler</u> case, the 1971 Lease terminated and was not reconducted or otherwise revived by the 2003 Lease, and any termination/vesting provisions of the 1971 Lease would have been triggered.

     Finally, the instant case is distinguishable from the non-Louisiana cases cited by Maersk/UMSC.  First, the <u>Tully</u> case involved two leases that both provided that the lessee could make

and retain ownership of improvements at termination of the leases.  <u>Tully</u>, 189 F.2d at 196.  Also, the <u>Bergh</u> case involved a tenant's right to remove improvements under a series of leases, none of which provided a right of removal as a matter of contract.  <u>Bergh</u>, 136 F. at 370.  The instant case involves leases that expressly provide removal rights, but condition those rights on termination.  Also, the <u>Lilenquist</u> case involved a situation in which the plaintiff-lessee's removal rights were expressly recognized in a subsequent lease.  <u>Lilenquist</u>, 525 P.2d at 349.  The 2003 Lease in this case does not expressly recognize UMSC or Maersk's right to remove improvements under the 1971 Lease, unless such a right is implicit in the reservation-of-rights clause in §45 of the 2003 Lease.  In any event, the Forfeiture Rule as rejected by the cases cited by Maersk/UMSC only applies when one or all of multiple leases are silent on the issue of ownership of improvements at termination of the first lease.  In this case, however, *all* the leases include specific, if conflicted and inconsistent, termination/vesting provisions.  Thus, the non-Louisiana cases cited by Maersk/UMSC are not similar enough to constitute persuasive authority.

**C.  The Parties Motions**

While the above legal principles establish generally that the 1971 Lease terminated on execution of the 2003 Lease, the specific vesting provisions of the various leases and amendments

between the Dock Board and Maersk/UMSC will determine the right
to claim ownership of specific improvements among the parties.
Under these complicated and interrelated leases, the Court finds
that there are material issues of fact that preclude summary
judgment on the issue of the parties' potential rights to claim
ownership of pre-October 1, 2003 improvements.  Therefore, both
parties' motions for partial summary judgment should be denied
for the reasons set forth below, except as to a few specific
improvements.

**1) The general termination/vesting provisions of the 1971 and 2003 Leases**

First of all, while the 2003 Lease expressly terminated the
1971 Lease, which would at first glance trigger the general
termination/vesting provisions of §19.03 of the 1971 Lease in
favor of the Dock Board, several other provisions in the various
leases defeat this conclusion.

Initially, the 2003 Lease provision terminating the 1971
Lease contains a reservation of rights in §45: "this provision
shall not be interpreted in any way to waive any rights which one
party may have against the other arising out of that lease
between the [Dock Board] and Maersk, Inc., effective August 19,
1971."  While the Dock Board argues that this reservation-of-
rights provision was intended only to protect the Dock Board's
right to unpaid rent under the 1971 Lease, there is no language

31

to that specific effect in the provision itself.  As such, this broadly stated reservation of rights should be read to protect *all* rights that either party might have under the 1971 Lease. See La. Civ. Code Art. 2046 (2008) ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."); La. Civ. Code Art. 2049 (2008) ("A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.").

Furthermore, §19.03 of the 1971 Lease provides one of these residual rights in favor of Maersk/UMSC.  While the Dock Board argues that the 1971 Lease mandates vesting of title to *all* improvements in the Dock Board at its termination, a close reading of the lease reveals that this is not the case.  §19.03 provides that title to any improvements made under the 1971 Lease will vest in the Dock Board at termination of the 1971 Lease, but only as to those improvements **"which are required by [the Dock Board] to be removed**" from the premises.  As noted by Maersk/UMSC, the Dock Board never executed a move-out survey at the time the 2003 Lease terminated the 1971 Lease, nor is there any allegation by either the Dock Board or USMC/Maersk that the Dock Board ever "required" Maersk/UMSC to remove any improvements at the time the 1971 Lease terminated.  As such, title to any

improvements made under §19.03 of the of the 1971 Lease *never vested in the Dock Board* because the Dock Board apparently never required Maersk/UMSC to remove any improvements at termination of the 1971 Lease.  Furthermore, §19.03 allows the parties to make "other arrangements . . . in writing" regarding disposition of improvements under the 1971 Lease at its termination.  Thus under §19.03, the Dock Board never took title to improvements under the 1971 Lease because it never demanded removal of any improvements. Alternatively, even if the Dock Board did somehow have title to improvements, the reservation-of-rights provision of §45 of the 2003 Lease resurrected Maersk/UMSC's right under §19.03 to make other written arrangements for disposition of those improvements, either prior to or even after a demand of removal by the Dock Board.  Accordingly, the Dock Board is not entitled to claim ownership of any pre-October 1, 2003 improvements under the general termination/vesting provision in §19.03 of the 1971 Lease, and its motion for partial summary judgment should be denied.

However, this does not mean that Maersk/UMSC's motion on the same issue should be granted.  The Dock Board's principal argument in this case is that §19(G) of the 2003 Lease is the only relevant provision governing the outcome of this case. §19(G) provides in full:

In the event of termination of this Lease [as a result of destruction of the premises], Lessee shall be entitled to receive from the insurance proceeds Lessee's insurable leasehold interest in those improvements on the Leased Premises approved by the Board and paid for by Lessee pursuant to the provisions Sections 8 . . . and 15 . . . Above.  In the event Lessee receives the insurance proceeds for damage to improvements, Lessee shall be obligated to remove from the Leased Premises the damaged improvements."[16]

Under this provision, the Dock Board argues that since the 1971

Lease was terminated by the 2003 Lease, §19(G) is the only

provision that governs disposition of all improvements on the

leased property.  Accordingly, the Dock Board asserts that any

pre-October 1, 2003 improvements could not have been "approved"

by the Dock Board under the relevant provisions of the 2003 Lease

because that lease was not in effect prior to October 1, 2003.

Also, the Dock Board asserts that any improvements could not have

been "paid for" by UMSC as lessee because UMSC was not a lessee

prior to October 1, 2003.  As a result, the Dock Board claims

ownership of *all pre-October 1, 2003 improvements* at the France

Road Terminal.  However, despite the Dock Board's argument,

§19(G) also provides that "in the event" UMSC receives insurance

proceeds on leasehold improvements, it will be obligated to

remove them.  This provision suggests the possibility that UMSC

might receive insurance proceeds *even if the proceeds were paid

on unapproved and non-lessee funded improvements.*  Also,

---

[16] Pl.'s Memo Supp. Sum. J., Ex. 1 at §19(G).

Maersk/UMSC argue, that they are essentially the same entity, and thus any pre-October 1, 2003 improvements were "approved" by the Dock Board by acquiescence and "paid for" by the lessee because Maersk (as acquirer of Sea-Land) would have paid for them under the 1971 Lease.  The dispute over the meaning and effect of §19(G) is rooted in the factual question of whether Maersk and UMSC can be considered the same entity for purposes of the 2003 Lease.  The Court finds that there are material issues of fact regarding the relationship between Maersk and UMSC that preclude summary judgment in their favor.

Specifically, the record is replete with confusion over the actual day-to-day relationship between Maersk and UMSC.  For example, the 30(b)(6) deposition of the Dock Board revealed that the Dock Board, Maersk, and UMSC engaged in "considerable discussion" over the inclusion of §45 in the 2003 Lease because "we [the Dock Board] were never sure at any one point in time who worked for whom and under what their legal relationship were (sic)."  Def. Memo Supp. Summ. J., Ex. A at 71.  This confusion existed despite the fact that UMSC is admittedly a subsidiary of Maersk.  Further, Maersk/UMSC note that §21(iii) of the 2003 Lease restricted UMSC's right to assign the lease, given the Dock Board's responsibilities as a quasi-public entity, unless the assignment were in favor of Maersk or APMT.  This preferential treatment of Maersk in the face of the Dock Board's public duties

suggests that the Dock Board may have known that UMSC and Maersk were significantly related.  However, the fact that Maersk and APMT were named as possible unrestricted assignees also highlights the fact that those two entities *were clearly not considered lessees* under the 2003 Lease in any fashion.  As such, and as argued by the Dock Board, Maersk avoided the responsibilities of a lessee by making UMSC the lessee under the 2003 Lease.  Finally, the Dock Board's consent to the 1999 assignment of Sea-Land's lease to Maersk included a recognition that UMSC "shall operate the Premises on behalf of Maersk."  Def. Memo Supp. Summ. J, Ex. A at Ex. 5 ¶5.  All these examples underscore that the relationship between Maersk and UMSC, as well as the Dock Board's understanding of that relationship and its legal effect, are far from certain.  Accordingly, the parties' motions for partial summary judgment should be denied insofar as this relationship remains in question.

**2) The parties' claims to the gantry crane rails and electrical service equipment**

Additionally, the Dock Board specifically claims ownership of gantry crane rails and electrical service equipment for gantry crane operation under the 2003 Lease.  Section 16 of the 2003 Lease provides that "any gantry crane rails and any electrical service equipment for operations of gantry cranes installed by

36

Lessee on the Leased Premises shall become the property of the
Board at termination of this Lease without any obligation of the
Board" to pay the value of those improvements.[17]  However, this
provision hinges on the true identity or identities of the
"Lessee" under the 2003 Lease, which as noted above is unclear in
the record.[18]

Furthermore, the 1971 Lease includes language similar to the
"tenancy thereafter" language of the Pendleton case in reference
to the specific improvements of the gantry crane rails and
electrical service equipment.  Section 2.03 of the 1971 Lease
provides that "[a]ny gantry crane rails and any electrical

---

[17]  Pl.'s Memo Supp. Sum. J., Ex. 1 at §16.

[18] The Dock Board cites In Re Complaint of Clearsky Shipping
Corp., 1998 WL 770498, to support its argument that allowing UMSC
to collect insurance proceeds on the gantry crane rails and
electrical equipment will result in a windfall.  Clearsky
involved the allision of the M/V Bright Field with the New
Orleans Riverwalk.  Id. at *1.  In Clearsky, a tenant of the
Riverwalk sought damages from the vessel owner for destruction of
leasehold improvements it had made under a lease with the
Riverwalk, which the Riverwalk terminated due to the destruction
of the leased premises.  Id. The lease provided that the
improvements at issue would become the property of the Riverwalk
at termination of the lease.  Id.  The Clearsky court held that
the tenant was not entitled to damages because the improvements
were owned by the Riverwalk under the lease.  Id. at *3.
Specifically, the Clearsky court noted that if the tenant could
collect damages, it would "walk[] away from the Lease without any
obligation to repair or replace the improvements, and its
recovery . . . would be a windfall."  Id.  However, unlike
Clearsky there is no definitive lease provision unequivocally
vesting ownership of improvements in the Dock Board at
termination of a lease, and thus Clearsky is not on point.

service equipment for operation of gantry cranes installed by
Sea-Land [Maersk] . . . shall become the property of the [Dock
Board] at the termination of Sea-Land's [Maersk's] **occupancy"** of
the France Road Terminal.[19]  Thus, as to gantry crane rails and
electrical service equipment for gantry crane operation that were
installed by Sea-Land (Maersk) under the 1971 Lease, the language
of Section 2.03 parallels the language of the lease in <u>Pendleton</u>.
As such, Maersk/UMSC can claim ownership of gantry crane rails
and the attendant electrical systems under the 1971 Lease,
notwithstanding the 2003 Lease's termination of that lease, *if
UMSC's occupancy of the France Road Terminal can be construed as
a continued occupancy by Maersk*.  As noted above, the present
record presents significant issues of material fact regarding
whether UMSC's operation of the France Road Terminal on behalf of
Maersk constituted continued "occupancy" under the 1971 Lease or
whether Maersk can be considered the "Lessee" under Section 8 of
the 2003 Lease.  Thus both parties' motions for partial summary
judgment on the issue of right to claim ownership of the gantry
crane rails and electrical service equipment should also be
denied.

  **3) The parties' claims to the specific improvements under
  the 1973 Amendment**

---

     [19]  Pl.'s Memo Supp. Sum. J., Ex. 2 at §2.03 (emphasis
added).

Finally, the only portion of the parties' cross motions that can be fully determined on the present record is the right to claim ownership of the improvements made pursuant to the 1973 Amendment.  The 1973 Amendment enumerated 13 specific improvements[20] to be constructed by Sea-Land, and provided in ¶3 that:

> [i]n the event that [the 1971 Lease] should not become of force and effect or in the event of termination of the lease, **for any cause**, the facilities and improvements described in this paragraph that are to be constructed solely for the account of Sea-Land shall then be and become property of the [Dock Board], without any obligation on the part of the [Dock Board] to pay to Sea-Land either the cost or the value thereof and without the necessity of any documentation of title beyond the provisions of this agreement.[21]

Maersk/UMSC argue that although this provision expressly vests title to the 13 improvements in the Dock Board, the 1973 Amendment nonetheless did not strip Maersk of its general right to remove improvements prior to termination of the 1971 Lease. However, as in <u>Clearsky</u>, the plain language of 1973 Amendment unequivocally vests title in the Dock Board to the 13 improvements in ¶3 upon termination of the 1971 Lease "for any

---

[20]   These improvements included 1) concrete dolly strips, 2) precast concrete backing logs, 3) asphalt paving, 4) shells in a parking lot, 5) painted striping, 6) drain manholes and drop inlets, 7) concrete drain pipe, 8) concrete islands, 9) exterior electrical installations, 10) railroad siding, 11) holding lanes with curbs, 12) access road, 13) truck scales and attendant equipment. Pl.'s Memo Supp. Summ. J., Ex. 3 at ¶3.

[21]   Pl.'s Memo Supp. Summ. J., Ex. 3 at ¶3 (emphasis added).

cause." Therefore, the express provisions of the 1973 Amendment override the general right to remove as provided in the 1971 Lease. As a result, there is no material issue of fact as to the Dock Board's right to claim ownership of these 13 specific improvements. Therefore, the Dock Board's motion for partial summary judgment should be granted as to these 13 improvements, and Maersk/UMSC's motion should be denied. **Accordingly,**

**IT IS ORDERED** that the Dock Board's Motion for Partial Summary Judgment is **GRANTED IN PART** as to the right to claim ownership of the 13 specific improvements made under paragraph 3 of the 1973 Amendment.

**IT IS FURTHER ORDERED** that the parties' **Cross Motions for Partial Summary Judgment (Rec. Docs. 90 & 92)** are hereby **DENIED IN PART** as to the right to claim ownership of all other improvements made under the 1971 Lease and the 2003 Lease generally, given the relevant provisions of those leases and the uncertainty of the relationship between Maersk and UMSC and the Dock Board's knowledge of that relationship.

New Orleans, Louisiana this 4th day of November, 2008.


CARL J. BARBIER
UNITED STATES DISTRICT JUDGE